IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00879–EWN–CBS


TRACEY CORDOVA,
MORGAN DOUTHIT, and
DIVINITY CORDOVA,

      Plaintiffs,

v.

DEREK ARAGON, and
CITY OF COMMERCE CITY,

      Defendants.

---

## ORDER AND MEMORANDUM OF DECISION
---

      This is a civil rights and wrongful death case. Plaintiff Tracey Cordova, as personal

representative of the estate of Toby Cordova, alleges that Defendants Derek Aragon and the City

of Commerce City violated Mr. Cordova's Fourth Amendment rights by using excessive force to

terminate a police chase by fatally shooting Mr. Cordova. Plaintiffs Tracey Cordova, Morgan

Douthit, and Divinity Cordova — as Mr. Cordova's survivors — also assert state law claims for

wrongful death. This matter is before the court on Defendants' "Combined Motion and

Memorandum Brief in Support of Motion for Summary Judgment," filed December 27, 2007,

Defendants' "Motion to Strike Plaintiffs' Untimely Expert Disclosures," filed March 12, 2008,

and Defendants' "Motion to Exclude Expert Testimony," filed May 2, 2008. Jurisdiction is

proper pursuant to 28 U.S.C. §§ 1331, 1367.

## FACTS

### 1. Factual Background

On May 3, 2006, Officer James Zamora of the Commerce City Police Department

("CCPD") was patrolling the area of Fairway Drive and Heartland Drive in the Reunion

subdivision of Commerce City, Colorado. (Combined Mot. and Mem. Br. in Supp. of Mot. for

Summ. J. [hereinafter "Defs.' Br."], Statement of Undisputed and Assumed Facts [hereinafter

"SOF"] ¶ 1 [filed Dec. 27, 2007]; *admitted at* Pls.' Mem. in Opp'n to Combined Mot. and Mem.

Br. in Supp. of Mot. for Summ. J. [hereinafter "Pls.' Resp."], Resp. to Statement of Undisputed

Material Facts [hereinafter "RSOF"] ¶ 1 [filed Jan. 23, 2008].) This area was the site of new

home construction, and there had recently been repeated thefts from construction sites. (*Id.*, SOF

¶ 2; *admitted at* Pls.' Resp., RSOF ¶ 2.)

At approximately 12:58 A.M., Officer Zamora observed a suspicious truck, which was

later identified as a 1990 Chevrolet with dual wheels, towing a trailer on which there was a skid-

steer loader.[1] (*Id.*) The loader was later determined to have been stolen. (*Id.*, SOF ¶ 65;

*admitted at* Pls.' Resp., RSOF ¶ 65.) After running the license plate number, Officer Zamora

determined that the trailer was not registered to an address in the vicinity. (*Id.*, SOF ¶ 3;

*admitted at* Pls.' Resp., RSOF ¶ 3.) Officer Zamora initiated a traffic stop near the 10500 block

---

[1]It appears for various deposition statements that a "skid-steer loader" is a piece of heavy
excavation equipment.

of Chambers Drive, but the truck failed to stop after Officer Zamora activated both his overhead lights and emergency siren. (*Id.*, SOF ¶¶ 5–6; *admitted at* Pls.' Resp., RSOF ¶¶ 5–6.) The truck proceeded through a solid red light at the intersection of 104th Avenue and Chambers Road, turned, and headed west on 104th Avenue. (*Id.*, SOF ¶ 7; *admitted at* Pls.' Resp., RSOF ¶ 7.)

Officer Janae Rubino, also of the CCPD, heard over the radio that Officer Zamora was initiating a traffic stop of a suspicious vehicle and headed toward his location. (*Id.*, SOF ¶ 8; *admitted at* Pls.' Resp., RSOF ¶ 8.) Officer Derek Aragon and his trainee, Officer Dax Nance[2] — also both of the CCPD — heard and did likewise. (*Id.*, SOF ¶¶ 9–10; *admitted at* Pls.' Resp., RSOF ¶¶ 9–10.)

After radio contact with his supervisor, Sgt. Scott Robinson, Officer Zamora was ordered to terminate the pursuit near 104th Avenue and Blackhawk Street. (*Id.*, SOF ¶ 11; *admitted at* Pls.' Resp., RSOF ¶ 11.) Officer Zamora turned south on Blackhawk, aired his location and the direction the truck was traveling, deactivated his lights and sirens, and came to a stop. (*Id.*, SOF ¶ 12; *admitted at* Pls.' Resp., RSOF ¶ 12.) Sgt. Robinson aired that officers should attempt to seal off the area if possible, in case the suspect attempted to flee on foot. (*Id.*, SOF ¶ 13; *admitted at* Pls.' Resp., RSOF ¶ 13.)

---

[2]Although Officer Nance was a CCPD "trainee," he had eight years' prior experience with the Federal Heights Police Department. (Pls.' Resp., Statement of Additional Disputed Facts and Inferences [hereinafter "SAF"] ¶ 28; *admitted at* Reply Br. in Supp. of Mot. for Summ. J. [hereinafter "Defs.' Reply"], Resp. to Statement of Additional Disputed Facts and Inferences [hereinafter "RSAF"] ¶ 28 [filed Feb. 19, 2008].)

Officer Zamora sat in his patrol car for a few moments and watched the taillights of the truck as it crossed Highway 2. (*Id.*, SOF ¶ 14; *admitted at* Pls.' Resp., RSOF ¶ 14.) Officer Zamora again aired the truck's location. (*Id.*) Once the truck was a mile or more down the road, Officer Zamora made a u-turn and continued down westbound 104th Avenue, maintaining his distance and not pursuing the truck. (*Id.*, SOF ¶ 15; *admitted at* Pls.' Resp., RSOF ¶ 15.)

As Officer Zamora proceeded down 104th Avenue, he noticed that a train was crossing the road, blocking any traffic. (*Id.*, SOF ¶ 16; *admitted at* Pls.' Resp., RSOF ¶ 16.) Officer Zamora aired on his radio that the train was blocking the road, and that the truck was likely blocked within the general area. (*Id.*, SOF ¶ 17; *admitted at* Pls.' Resp., RSOF ¶ 17.) Officers Aragon and Nance were on the other side of the passing train. (*Id.*, SOF ¶ 18; *admitted at* Pls.' Resp., RSOF ¶ 18.) Officer Zamora then watched the truck pull into a business parking lot off of 104th Avenue. (*Id.*, SOF ¶ 19; *admitted at* Pls.' Resp., RSOF ¶ 19.) The truck went to the back of the parking lot and turned off its lights. (*Id.*)

Along with Officers Rubino and Walkinshaw,[3] Officer Zamora attempted to set up a perimeter around the building and the parking lot to prevent the truck from leaving. (*Id.*, SOF ¶ 20; *admitted at* Pls.' Resp., RSOF ¶ 20.) By the time Officer Zamora entered the parking lot, however, the truck had turned around and was headed straight in Officer Zamora's direction. (*Id.*, SOF ¶ 21; *admitted at* Pls.' Resp., RSOF ¶ 21.) Officer Zamora moved out of the way and spun around to follow the truck. (*Id.*) Officer Rubino affied that the truck drove directly at her,

---

[3]Neither party provides Officer Walkinshaw's first name.

and that she had to make an evasive turn to avoid being hit. (*Id.*, Ex. B ¶ 5 [Rubino Aff.].)

Officer Rubino aired on the radio that the truck had attempted to ram her, and Officers Aragon, Nance, and Zamora heard the communication. (*Id.*, SOF ¶ 23; *admitted at* Pls.' Resp., RSOF ¶ 23.)

The pursuit restarted, and the officers in the area activated their lights and sirens in an attempt to stop the truck. (*Id.*, SOF ¶ 24; *admitted in relevant part at* Pls.' Resp., RSOF ¶ 24.) Despite the lights and sirens of multiple police vehicles, the truck again refused to stop. (*Id.*, SOF ¶ 25; *admitted in relevant part at* Pls.' Resp., RSOF ¶ 25.) Based upon the truck's alleged attempted ramming of Officer Rubino's patrol car, both Officers Zamora and Rubino affied that they felt the truck had become a "deadly weapon," and Officer Rubino affied that she believed the truck's driver "had endangered [her] life." (*See id.*, Ex. A. ¶ 11 [Zamora Aff.], Ex. B. ¶ 6 [Rubino Aff.].)

The truck got back onto 104th Avenue, this time traveling east, and ran through a red light at the intersection of 104th Avenue and Highway 2. (*Id.*, SOF ¶ 27; *admitted at* Pls.' Resp., RSOF ¶ 27.) The truck turned north on Highway 2. (*Id.*) Officers Aragon and Nance, who were still blocked by the train, decided to take an alternate route to get ahead of the truck and deploy "stop sticks." (*Id.*, SOF ¶ 28; *admitted at* Pls.' Resp., RSOF ¶ 28.) Officers Aragon and Nance eventually positioned their patrol car on Sable Road — into which Highway 2 turns as it approaches I-76 — and deployed the sticks. (*Id.*, SOF ¶ 29; *admitted at* Pls.' Resp., RSOF ¶ 29.)

Meanwhile, Officer Zamora had accelerated past the truck— which was traveling at about forty miles per hour — and pulled off to the side of the road to lay stop sticks of his own in

the lanes of travel.  (*Id*., SOF ¶¶ 30–31; *admitted at* Pls.' Resp., RSOF ¶¶ 30–31.)  The truck

drove onto the shoulder to avoid the sticks and continued down the road.  (*Id*., SOF ¶ 32;

*admitted at* Pls.' Resp., RSOF ¶ 32.)  Officer Zamora retrieved the sticks and rejoined the pursuit

behind Officer Rubino.  (*Id*., SOF ¶ 33; *admitted at* Pls.' Resp., RSOF ¶ 33.)

Before the truck reached the stop sticks laid by Officers Aragon and Nance, it turned onto

the entrance ramp for eastbound I-76.  (*Id*., SOF ¶ 34; *admitted at* Pls.' Resp., RSOF ¶ 34.)

Officers Aragon and Nance retrieved their stop sticks and joined the pursuit on I-76.  (*Id*., SOF ¶

35; *admitted at* Pls.' Resp., RSOF ¶ 35.)  On I-76, Officer Zamora again accelerated past the

truck, and again deployed stop sticks across the road.  (*Id.*, SOF ¶ 36; *admitted at* Pls.' Resp.,

RSOF ¶ 36.)  The truck again avoided the sticks by going off the road.  (*Id.*, SOF ¶ 37; *admitted

at* Pls.' Resp., RSOF ¶ 37.)

Officer Aragon affied that he was concerned that the truck might try to cross the median

and travel against traffic in the westbound lanes of I-76.  (*Id*., Ex. D ¶ 12 [Aragon Aff.].)  This

concern was allegedly premised upon behavior Officer Aragon had seen in previous pursuits, in

which "a fleeing suspect attempted to escalate the danger of a pursuit in order to avoid

apprehension."  (*Id*.)  Consequently, Officer Aragon affied that he "crossed the median and went

into the westbound lanes of I-76 to warn traffic of the potential danger."  (*Id.*)  The truck also

crossed the median and began traveling east in the westbound lanes of I-76.  (*Id.*, SOF ¶ 40;

*admitted in relevant part at* Pls.' Resp., RSOF ¶ 40.)  Sgt. Robinson ordered the pursuit

terminated as soon as he learned that cars were traveling east in the westbound lanes of I-76 and

did not know that Officer Aragon had crossed over the median until after the chase had terminated.[4]  (Pls.' Resp., SAF ¶ 47; *admitted at* Defs.' Reply, RSAF ¶ 47.)

After crossing the median, Officer Aragon — who was traveling east in the rightmost lane of westbound I-76 from his perspective — either slowed or stopped his patrol car.  (Defs.' Br., SOF ¶ 41; *denied at* Pls.' Resp., RSOF ¶ 41.)[5]  Both Officers Aragon and Nance affied that the truck approached their position at approximately forty to fifty miles per hour and attempted to hit their patrol car, despite having room to pass on their left.  (*See id.*, Ex. C ¶ 14 [Nance Aff.], Ex. D ¶ 14 [Aragon Aff.].)  Officer Aragon further affied that: "[the truck] came within one or two feet of ramming us, and had I not accelerated and veered toward the median, I believe the truck would have hit us."  (*Id.*, Ex. D ¶ 14 [Aragon Aff.].)  Both Officers Aragon and Nance affied that they believed the driver of the truck was "extremely dangerous" based on his alleged attempted ramming of their own patrol car, as well as that of Officer Rubino.  (*Id.*, Ex. C ¶ 15 [Nance Aff.], Ex. D ¶ 15 [Aragon Aff.].)

Officer Aragon accelerated and was able to pass the truck.  (*Id.*, SOF ¶ 44; *admitted at* Pls.' Resp., RSOF ¶ 44.)  Officer Aragon affied that he "got far enough where [he] thought it was safe to stop," and that he parked his patrol car "just before the entrance ramp [from] 136th

---

[4]It is unclear from the record whether Officer Aragon ever heard Sgt. Robinson's order to cease the pursuit.

[5]Defendants allege that Officer Aragon "slowed his patrol car in the rightmost lane of I-76 (from his perspective)" whereas Plaintiffs allege that "[Officer] Aragon stopped his patrol car in the right most [sic] (fast lane) of westbound I-76."  (*Compare* Defs.' Br., SOF ¶ 41, *with* Pls.' Resp., RSOF ¶ 41.)

Avenue at an angle, with the overhead lights activated." (*Id.*, Ex. D ¶ 16 [Aragon Aff.].) Officer Aragon later recounted that he positioned his car to lead the truck's driver to either cross back into the eastbound lanes of I-76, or to exit I-76 completely by taking the entrance from 136th Avenue. (Pls.' Resp., Ex. 10 at 6–7 [Aragon Dep.], Ex. 18 at 9–10 [5/3/06 Statement].) Nonetheless, Officers Aragon and Nance have differing memories regarding the direction that the patrol car was facing after it was parked; Officer Aragon remembers that it was facing the entrance ramp from 136th Avenue, whereas Officer Nance remembers that it was facing the median. (*See id.*, SAF ¶ 1; *admitted at* Defs.' Reply, RSAF ¶ 1.)

Before exiting the patrol car, Officer Aragon told Officer Nance to exit and take cover behind the vehicle. (*Id.*, SAF ¶ 8; *admitted at* Defs.' Reply, RSAF ¶ 8.) Officer Nance exited the car and ran to the grassy median separating the eastbound and westbound lanes of I-76. (Defs.' Br., SOF ¶ 47; *admitted at* Pls.' Resp., RSOF ¶ 47.) Officer Aragon retrieved the stop sticks from the backseat of his patrol car. (*Id.*, SOF ¶ 48; *admitted at* Pls.' Resp., RSOF ¶ 48.) Officer Nance recalled that Officer Aragon got these sticks from the rear driver's side door of his vehicle. (Pls.' Resp., SAF ¶ 31; *admitted at* Defs.' Reply, RSAF ¶ 31.)

Officer Nance affied that the truck appeared to be heading in his direction, and that, fearing for his life, he drew his weapon and pointed it at the truck. (Defs.' Br., Ex. C ¶ 18 [Nance Aff.].) Officer Nance then saw the truck swerve away from him, and toward Officer Aragon's position. (*Id.*, SOF ¶ 52; *admitted at* Pls.' Resp., RSOF ¶ 52.) Officer Nance later testified that he could not say whether he would have shot the truck's driver had the truck

remained traveling straight at him because he "had time to decide whether [he] could go left or right." (Pls.' Resp., Ex. 8 at 5 [Nance Aff.].)

Officer Aragon affied that he "took a few steps to try to get in position to deploy the [stop sticks], when [he] realized that the truck was too close." (Defs.' Br., Ex. D ¶ 19 [Aragon Aff.].) Officer Aragon stated that he "feared for [his] life," and that the truck was "bearing down on [him]." (*Id.*) As Officer Aragon recounted: "Knowing that I was in immediate danger, that I was about to be run over, I fired my weapon rapidly at the vehicle as I tried to move out of the way." (*Id.*, Ex. D ¶ 22 [Aragon Aff.].) It appears from the record that Officer Aragon fired either four or five shots. (*See* Def.'s Br. at 13; Pl.'s Resp. at 15.) Officer Aragon asserted that he opened fire for "one or two seconds," and that, while he was firing, he felt that he was "in imminent danger of death." (*Id.*, Ex. D ¶ 25 [Aragon Aff.].) As to the proximity of the truck, Office Aragon affied that "the truck came very close to me and barely missed my body." (*Id.*, Ex. D ¶ 22 [Aragon Aff.].)

Officer Nance heard a one-to-two second succession of shots and immediately hit the ground. (*Id.*, SOF ¶¶ 60–61; *admitted at* Pls.' Resp., RSOF ¶¶ 60–61.) Officer Nance did not see muzzle flashes. (Pls.' Resp., SAF ¶ 26; *admitted at* Defs.' Reply, RSAF ¶ 26.) When Officer Nance got back up from the ground, he saw Officer Aragon standing on the far side of I-76, tracking the path of the truck with his gun. (*See id.*, SAF ¶ 24; *admitted at* Defs.' Reply, RSAF ¶ 24; *see also id.*, Ex. 22 at 2 [Nance Diagram] [depicting Officer Aragon's terminal position to be on the far side of I-76].)

Officer Zamora, who was approaching the scene from the opposite eastbound lanes of I-76, recounted that "as the truck approached [Officer Aragon's] patrol car, it swerved and thrashed about, the[n] abruptly turned off the highway and crashed." (Defs.' Br., Ex. A ¶¶ 15–16 [Zamora Aff.].) It is undisputed that the truck turned off the roadway and crashed into a tree. (*Id.*, SOF ¶ 62; *admitted in relevant part at* Pls.' Resp., RSOF ¶ 62.) The other pursuing officers converged on the scene, and medical aid was called in for the driver of the truck. (*Id.*, SOF ¶ 63; *admitted at* Pls.' Resp., RSOF ¶ 63.)

The driver of the truck — later identified as Mr. Cordova — sustained a gunshot wound to the back quadrant his head. (*Id.*, SOF ¶ 64; *deemed admitted at* Pls.' Resp., RSOF ¶ 64.)[6] An autopsy revealed an entrance gunshot wound to the left side of the back of Mr. Cordova's head, and a smaller exit tear approximately two inches up and to the right. (Pls.' Resp., Ex. 25 at 2 [Criminalist Report]; *see also id.*, Ex. 15 at 2 [Autopsy Photo].) Physical evidence further suggests that the fatal bullet split in half when it struck Mr. Cordova's head, and that part lodged in the right front of his brain. (*Id.*, Ex. 25 at 2, 5 [Criminalist Report].) Harry Bonnell, a pathologist retained by Plaintiffs, also detected a second wound on the back of Mr. Cordova's neck, which he classified as a graze wound. (*Id.*, SAF ¶ 36; *deemed admitted at* Defs.' Reply, RSAF ¶ 36; *see also id.*, Ex. 15 at 2 [Autopsy Photo].)[7]

---

[6]Plaintiffs purport to deny this fact, but their "denial" merely consists of a more detailed description of the fatal wound suffered by Mr. Cordova. (*See* Pls.' Resp., RSOF ¶ 64.)

[7]Defendants do not deny that this is Mr. Bonnell's assessment, but merely claim that it is "not relevant or material on summary judgment." (Defs.' Reply, RSAF ¶ 36.)

Defendants concede for the purposes of this motion that one of the bullets fired by Officer Aragon hit the windshield of the truck, and that four bullets entered the side of the truck. (Defs.' Br. at 13.)  Plaintiffs do not dispute this characterization.  (*See* Pls.' Resp. at 15.) Moreover, Defendants concede — again for the purposes of this motion only — that the bullet which killed Mr. Cordova entered the truck through the side of the vehicle, and "was fired after some or all of the truck had passed Officer Aragon."  (Defs.' Br. at 13.)

Officer Nance testified that, following the incident, he asked Officer Aragon if he was okay, and that Officer Aragon replied, "I'm okay[,] [j]ust a little pissed."  (Pls.' Resp., Ex. 9 at 8 [Nance Dep.].)  Officer Aragon later denied ever having been "pissed" during the incident.  (*Id.*, Ex. 10 at 3 [Aragon Dep.].)  Officer Nance also moved Officer Aragon's patrol car, but admitted in a later deposition that the car's location was "prime to the crime scene" because it shed light on Mr. Cordova's line of travel.  (*See id.*, SAF ¶ 21, *admitted at* Defs.' Reply, RSAF ¶ 21; *see also id.* Ex. 9 at 7 [Nance Dep.].)  Officer Nance testified that he had not thought about this matter when he moved the car.  (*Id.*)  Sgt. Robinson later testified that, with eight years of prior experience, Officer Nance should have known that moving the patrol car constituted interference with a crime scene.  (*Id.*, SAF ¶ 49; *admitted at* Defs.' Reply, RSAF ¶ 49.)  As to the potential danger of leaving the car in its original location, Officer Aragon testified that the car's flashing lights could have been seen by westbound traffic on I-76 "a long ways," and that any "reasonable" motorist would have been able to see them and slow down.  (*Id.*, Ex. 10 at 9 [Aragon Dep.].)

Sometime on the day of the shooting, May 3, 2006, Officer Aragon gave a statement to two CCPD detectives. (*See id.*, Ex. 18 [5/3/06 Statement].) Officer Aragon recounted having fired two rounds while standing still in the path of the oncoming truck, and two additional rounds while moving out of the way of the truck. (*Id.*, Ex. 18 at 6 [5/3/06 Statement].) Officer Aragon also recounted that he was five to seven feet away from the truck when he fired the second two rounds into the driver's side window. (*Id.*, Ex. 18 at 13 [5/3/06 Statement].) Although his statements are at least ambiguous when read in context,[8] Officer Aragon appeared to assert that he had fired all four rounds from a position in front of the truck. (*See id.*, Ex. 18 at 21 [5/3/06 Statement].)[9] Officer Aragon later stood by the statements that he had made to the CCDP detectives — whatever their proper interpretation — in a subsequent deposition. (*See id.*, Ex. 10 at 4–5 [Aragon Dep.].)

Officer Aragon's use of deadly force was eventually investigated by the Adams County Critical Incident Team. (*Id.*, SAF ¶ 34; *admitted at* Defs.' Reply, RSAF ¶ 34.) Chris Pardo was the lead criminalist assigned to the investigation. (*Id.*, SAF ¶ 35; *admitted at* Defs.' Reply,

---

[8]The ambiguity relates to the fact that Officer Aragon and the detectives appeared to be discussing the relative positions of Officer Aragon and the truck by reference to various angles each was pointing out on diagrams. (*See, e.g.*, Pls.' Resp., Ex. 18 at 21–23 [5/3/06 Statement].)

[9]For instance, Plaintiffs cite the following exchange:

Q.    So all of [the shots] were from the front direction?
A.    Correct.
Q.    Ok nothing from the side nothing from the rear?
A.    No.

(*See* Pl.'s Resp., Ex. 18 at 23 [5/3/06 Statement].)

RSAF ¶ 35.)  Mr. Pardo testified that the wound to the back of Mr. Cordova's head was inconsistent with shots being fired from the front of Mr. Cordova's vehicle.  (*Id.*, SAF ¶ 36; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 36.)  Likewise, criminalist Brenda Harris, who had assisted Mr. Pardo in the investigation, testified that the shattering of both rear windows in the truck — which she believed to have been caused by a single bullet — was inconsistent with bullets fired exclusively from the front of the truck.  (*See id.*, SAF ¶ 38; *admitted at* Defs.' Reply,  RSAF ¶ 38; *see also id.*, Ex. 6 at 5–8 [Harris Dep.].)  As Detective Brad Barkley similarly testified:

> Officer Aragon's perception was that he had fired all of his rounds pretty much from the front of the vehicle; however, it — from the evidence as the vehicle passed, it would appear that two bullets entered the front and at least one or more entered toward the side or to the side rear of the vehicle as it passed him.  So, [Officer Aragon's] perception seemed to have been different than the facts.

(Pls.' Resp., Ex. 6 at 3 [Barkley Dep.]; *see also id.*, Ex. 11 at 3–4 [Claps Dep.].)

Sgt. Robert McCoy was put in charge of a separate investigation of the shooting mandated by CCPD's own internal policies.  (*Id.*, SAF ¶ 55; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 55.)  Sgt. McCoy testified that his investigation was never completed because CCPD Police Chief Brian Hebbard decided that the Adams County Critical Incident Team's investigation "was . . . complete enough for the command staff to base their findings on that report."  (*Id*., Ex. 13 at 4 [McCoy Dep.].)  Charles Baker, at various times either CCPD Deputy Police Chief or CCPD Acting Police Chief, acknowledged in a deposition that the purposes of CCPD's own internal investigations are to ensure that policies and procedures are followed and amended as needed, that policies are enforced, that discipline for violations is meted out, and that

future violations are deterred.  (*Id.*, SAF ¶ 51; *admitted at* Defs. Reply, RSAF ¶ 51; *see also id.*, Ex. 7 at 2–3 [Baker Dep.].)  Sgt. McCoy acknowledged that — in part because his investigation was never completed — he made no effort to determine whether Officer Aragon violated CCPD polices and procedures with respect to the deployment of stop sticks or driving on the wrong side of I-76.  (*Id.*, Ex. 13 at 13 [McCoy Dep.].)

Roger Willard, one of Plaintiffs' experts, affies that, "I fired a pistol the same make and model as that used by officer [sic] Aragon [and] [b]ased upon that experience, I determined that one trained in the use of that pistol in tactical shoot/no shoot scenarios would have no difficulty ceasing firing when the danger ceased."  (*Id.*, Ex. 4 at 1–2 [Willard Aff.].)  Sgt. McCoy acknowledged that, in firearms training, officers are taught that "as soon as the threat is gone . . . that they're not to fire anymore."  (*Id.*, Ex. 13 at 9 [McCoy Dep.].)  Mr. Willard further affies that, based on his evaluation of the Adams County Critical Incident Team's materials, "Officer Aragon crossed the median approximately one mile west of the location of the shooting," and that, "at [fifty] miles per hour this distance would be covered in approximately [seventy] seconds."  (*Id.*, Ex. 4 at 1 [Willard Aff.].)

Thomas Feiereisen, another of Plaintiffs' experts, affies that "the fatal bullet was fired from the left rear of the vehicle at an angle of about 135 degrees," and that "[Officer Aragon] was at least [thirteen] feet from the path of [Mr. Cordova's] vehicle when he fired those shots." (*Id.*, Ex. 1 at 2 [Feiereisen Aff.].)

Section 2.3.9.B of the CCPD Policy and Procedures Manual, pertaining the use of stop sticks, requires that "[o]fficers **MUST** deploy such devices from a position where they are

protected from being struck by the pursued vehicle." (*Id.*, Ex. 16 at 15 [CCPD Manual] [emphasis in original].)  CCPD trains its officers to deploy stop sticks from the side of the road and not to stand in the roadway during deployment.  (*Id.*, SAF ¶ 25; *admitted at* Defs.' Reply, RSAF ¶ 25.)  Sgt. Robinson acknowledged in a deposition that "common sense" would tell an officer to remove himself from danger if it were possible, and that, "[i]f you can get out of the way, get out of the way.  If you can't, you can't." (*Id.*, Ex. 14 at 6 [Robinson Dep.].)  Sgt. McCoy similarly testified that he "wouldn't want to jump in front of a [fifty]-mile-an-hour vehicle," but also testified that officers sometimes cannot tell how far away an approaching vehicle is.  (*Id.*, Ex. 13 at 11 [McCoy Dep.].)

Section 2.3.10 of the CCPD Policy and Procedures Manual, pertaining to the termination of police pursuits, recites: "no officer shall establish a termination roadblock, i.e., a roadblock with no exit option, without specific directions from a supervisor." (*Id.*, Ex. 16 at 15 [CCPD Manual].)  Officer Nance testified he had been trained that officers blocking a roadway must provide an escape route, and Sgt. Robinson acknowledged that this was CCPD policy.  (*Id.*, SAF ¶¶ 22, 48; *admitted in relevant part at* Defs. Reply, RSAF ¶¶  22, 48.)  Acting Police Chief Baker acknowledged that, if there were no pedestrians and no approaching cars, and "not knowing all the other elements of the situation," a police officer "probably" would not want to be in the channel he created for a fleeing suspect to escape.  (*Id.*, Ex. 7 at 8 [Baker Dep.].)  Nonetheless, Acting Police Chief Baker also testified:

> It would depend on the circumstances, I suppose.  If the officer was directing
> pedestrians or deploying stock sticks or a variety of things, there may be a period

when the officer would be in the channel, but if a pursuing vehicle was coming through, it would be reasonable for the officer to maintain a position of safety.

(*Id.*) Sgt. McCoy similarly testified that whether stop sticks could be deployed safely would be part of the consideration of an officer deploying them. (*Id.*, Ex. 13 at 13 [McCoy Dep.].)

Section 2.1.11 of the CCPD Policy and Procedures Manual, pertaining to the use of deadly force, recites that officers may only use such force "in protection of themselves or other persons from the immediate threat of death or serious bodily injury." (*Id.*, Ex. 16 at 4 [CCPD Manual].) Sgt. McCoy acknowledged that CCPD training did not track the language of this policy. (*Id.*, Ex. 13 at 7 [McCoy Dep.].) Instead, Sgt. McCoy testified that CCPD teaches its officers that deadly force may be used when a suspect has "the ability to commit an act against somebody, that person is actually in jeopardy or can be foreseen in jeopardy, and [the suspect] has the opportunity to cause harm to that person." (*Id.*, Ex. 13 at 3 [McCoy Dep.].) Sgt. McCoy further explained that: "if actions are such that [a suspect has] . . . shown the propensity of doing . . . violence to the point of trying to hurt someone, kill someone, that [an officer] can stop that threat to the public, and it does not have to be immediate." (*Id.*, Ex. 13 at 6 [McCoy Dep.].) Sgt. McCoy also stated that he would agree with the language of CCPD's written policy if he were told that the definition of "immediate" as used in the policy meant "imminent." (*Id.*)

## 2.    *Procedural History*

On April 27, 2007, Plaintiffs filed a complaint in this court. (Pl.'s [sic] Original Compl. and Jury Demand [filed Apr. 27, 2007].) On May 14, 2007, Plaintiffs filed an amended complaint in which: (1) Plaintiff Tracey Cordova alleged that Defendants violated Mr.

Cordova's Fourth Amendment right to be free from the use of excessive force in connection with an attempt to arrest him;[10] and (2) Plaintiffs Tracey Cordova, Morgan Douthit, and Divinity Cordova allege that Officer Aragon caused the wrongful death of Mr. Cordova under state wrongful death statutes.  (Compl. ¶¶ 13–26.)

On December 27, 2007, Defendants filed the instant summary judgment motion, arguing that: (1) Officer Aragon is entitled to qualified immunity on Plaintiff Tracey Cordova's Fourth Amendment claim; (2) the City of Commerce City is entitled to summary judgment on this same claim because Officer Aragon committed no underlying constitutional violation and because no municipal policy or custom caused Mr. Cordova's injuries; and (3) Officer Aragon is entitled to summary judgment on Plaintiffs' state law claims because Plaintiffs cannot show that Officer Aragon's actions were "willful and wanton" in order to overcome state governmental immunity. (Defs.' Br. at 15–32.)  On January 23, 2008, Plaintiffs responded.  (Pls.' Resp.)  On February 19, 2008, Defendants replied.  (Defs.' Reply.)

On March 12, 2008, Defendants moved to strike certain expert testimony and exhibits from Messrs. Feiereisen and Willard — some of which were included in Plaintiffs' response to Defendants' motion for summary judgment — because Plaintiff had allegedly failed to disclose

---

[10]Although neither party addressed the issue, Plaintiff Tracey Cordova appears to have standing to bring the instant section 1983 claims as the alleged personal representative of Mr. Cordova's estate.  (*See* Pl.'s [sic] First Am. Compl. and Jury Demand ¶ 1 [filed May 14, 2007] [hereinafter "Compl."] [alleging that Ms. Cordova is Mr. Cordova's personal representative]); *see also Granbouche v. Clancy*, 825 F.2d 1463, 1465 (10th Cir. 1987) ("In suits against state officials brought under 42 U.S.C. § 1983 [], questions of survivorship are decided by looking to state law."); *Hill v. Martinez*, 87 F. Supp. 2d 1115, 1121 (D. Colo. 2000) (finding that Colorado's survivorship statute permits a decedent's personal representative to bring a section 1983 claim premised upon the use of excessive force).

such evidence to Defendants in a timely fashion.  (Mot. to Strike Pls.' Untimely Expert Disclosures [filed Mar. 12, 2008].)  On April 1, 2008, Plaintiffs responded.  (Pls.' Mem. in Opp'n to Defs.' Mot. to Strike Pls.' Untimely Expert Disclosures [filed Apr. 1, 2008].)  On April 21, 2008, Defendants replied.  (Reply in Supp. of Mot. to Strike Pls.' Untimely Expert Disclosures [filed Apr. 21, 2008].)

On May 2, 2008, Defendants filed a motion to exclude certain expert testimony and exhibits from Messrs. Feiereisen and Willard under Rule 702 of the Federal Rules of Evidence and *Daubert*.  (Mot. to Exclude Expert Testimony [filed May 2, 2008] [hereinafter "Defs.' Exclusion Br."].)  As of the date of this order, Plaintiffs have not yet responded.  Currently pending before the court is Plaintiffs' motion to extend the time in which they may do so.

With the exception of Defendants' motion to exclude — which, for the reasons demonstrated below, is rendered moot — these matters are fully briefed and ripe for review.

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.     *Evaluation*

Defendants argue that they are entitled to summary judgment on each of Plaintiffs' claims because: (1) Officer Aragon is entitled to qualified immunity on Plaintiff Tracey Cordova's Fourth Amendment claim; (2) the City of Commerce City is entitled to summary judgment on this same claim because Officer Aragon committed no underlying constitutional violation and because no municipal policy or custom caused Mr. Cordova's injuries; and (3) Officer Aragon is entitled to summary judgment on Plaintiffs' state law claims because Plaintiffs cannot show that his actions were "willful and wanton" in order to overcome state governmental

immunity. (Defs.' Br. at 15–32.) I assess each argument in turn. Moreover, I consider

Defendants' motions to strike and to exclude certain evidence from Messrs. Feiereisen and

Willard only in passing and to the extent that granting or denying such motions could affect my

determination on summary judgment.

### a. *Officer Aragon's Qualified Immunity on Plaintiff Tracey Cordova's Fourth Amendment Claim*

Defendants first argue that Officer Aragon is entitled to qualified immunity on Plaintiff

Tracey Cordova's Fourth Amendment claim. (Defs.' Br. at 15–31.) Plaintiff Tracey Cordova

brings this claim pursuant to 42 U.S.C. § 1983 ("section 1983"), which provides a remedy for

constitutional violations committed by individuals acting under color of state law. (*See* Compl.

¶¶ 13–21); 42 U.S.C. § 1983 (2006). Specifically, section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983 (2006).

"The doctrine of qualified immunity shields government officials performing

discretionary functions from liability for damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known." *Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008). Under Tenth Circuit law, a

plaintiff seeking to avoid summary judgment on qualified immunity grounds must satisfy a

"heavy" two-part burden of showing that: (1) the defendant violated a constitutional or statutory

right; and (2) the right was clearly established at the time of the defendant's unlawful conduct. *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007) (citation omitted). I assess each prong of this two-part burden in turn.

### i. Officer Aragon's Violation of a Constitutional Right

The initial inquiry facing a court presented with a summary judgment motion based upon qualified immunity is: "'Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" *Fogarty v. Gallegos*, — F.3d —, 2008 WL 1765018, at *5 (10th Cir. Apr. 18, 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 [2001]). Plaintiff Tracey Cordova asserts that Officer Aragon violated the Fourth Amendment by using excessive force in connection with his attempted arrest of Mr. Cordova. (*See* Compl. ¶¶ 13–21; Pls.' Resp. at 26–29.) I first describe the law pertaining to Fourth Amendment excessive force claims, then determine which facts — taken in the light most favorable to Plaintiffs — are arguably relevant to this law. Finally, I assess whether such facts show that Officer Aragon's conduct violated the Fourth Amendment.

### (a) Law Governing Fourth Amendment Excessive Force Claims

"The Fourth Amendment forbids unreasonable seizures, including the use of force in making an arrest." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007). Determining whether the use of force in a particular case is excessive requires "'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 [1989]). The ultimate question "is whether the officers' actions are

objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. This determination, in turn, "'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Casey*, 509 F.3d at 1281 (quoting *Graham*, 490 U.S. at 396). Moreover, in the context of a police chase, the Supreme Court has held that, "in weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing [a driver]," it is appropriate to "take into account not only the number of lives at risk, but also their relative culpability." *Scott v. Harris*, — U.S. —, 127 S. Ct. 1769, 1777 (2007).

It is well-established that "[t]he use of force must be judged from the perspective of a reasonable officer 'on the scene,' who is 'often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation.'" *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (quoting *Graham*, 490 U.S. at 396–97.) Moreover, the Tenth Circuit has considered "'whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force,'" but has noted that such a consideration is "simply a specific application of the totality of the circumstances approach inherent in the Fourth Amendment reasonableness standard." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 [10th Cir. 1997]) (further quotations and citations omitted).

Finally, at the summary judgment stage, once a court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*," determining whether the movant's actions constituted a Fourth Amendment violation becomes "a pure question of law." *Harris*, 127 S. Ct. at 1776 n.8 (emphasis in original).

### (b) Facts Relevant to Plaintiff Tracey Cordova's Fourth Amendment Claim

In the instant case, Plaintiffs provide no coherent presentation of what they perceive to be the salient facts informing a Fourth Amendment objective reasonableness analysis, instead offering a series of unconnected single-sentence paragraphs — some of which constitute only rhetorical questions — which are presumably intended to convey some unarticulated theory of the case. (*See* Pls.' Resp. at 26–29.) To the extent that this theory may be deciphered and/or intuited, I determine whether — viewed in the light most favorable to Plaintiffs — the facts on record could reasonably support such a theory.

First, Plaintiffs appear to argue that Officer Aragon faced no immediate personal danger when he fired upon Mr. Cordova's truck, or that, alternatively, any danger he did face was abated after his first or second shots, thus rendering the additional shots unnecessary to his self-defense. (*See, e.g.*, *id.* at 2, 8, 27–28.) I find that the facts, taken in the light most favorable to Plaintiffs, could support either variation of this theory.

With respect to whether Officer Aragon ever faced immediate personal danger, Plaintiffs hint that a jury could find Officer Aragon's testimony pertaining to such a danger unbelievable

because: (1) Officer Aragon had a perceived motive to fabricate his testimony;[11] and (2) the alleged inconsistencies between Officer Aragon's statements to CCPD detectives on the day of the shooting and the later findings of the Adams County Critical Incident Team cast legitimate doubt upon the truthfulness of Officer Aragon's testimony generally. (*See id*. at 3, 28.) I agree. While the undisputed evidence suggests that Officer Aragon fired at least one bullet from a position in front of the oncoming truck, (*see, e.g.*, Defs.' Br. at 13 [stating that "only one of the bullets fired by Officer Aragon hit the windshield of the truck"]; Pls.' Resp. at 15 [not disputing this characterization], Ex. 6 at 3 [Barkley Dep.] [Detective Barkley stating that, "from the evidence as the vehicle passed, it would appear that two bullets entered the front"]), no evidence — outside of Officer Aragon's own testimony — sheds competent light upon the distance between Officer Aragon and the truck when he commenced firing,[12] or upon the speed of the truck. As such, I find that a reasonable jury could properly discredit Officer Aragon's testimony that he was in immediate personal danger when he fired the one or two shots from a position in front of Mr. Cordova's truck, and conclude — in the absence of any additional evidence on this point — that he was never in any immediate personal danger.

----

[11]Specifically, Plaintiffs charge that "[a] jury could conclude that [Officer] Aragon fabricated his fear because he knew his shooting of [Mr.] Cordova was in violation of the law, both civil and criminal." (Pls.' Resp. at 3.)

[12]The closest such evidence is Officer Nance's undisputed testimony that he saw the truck swerve away from his position and toward Officer Aragon shortly before the shooting. (Defs.' Br., SOF ¶¶ 52, 61; *admitted at* Pls.' Resp., RSOF ¶¶ 52, 61.) Nonetheless, without any evidence pertaining to the speed of the truck, Officer Nance's position relative to the truck, or Officer Nance's position relative to Officer Aragon, it is impossible to determine from such testimony where the truck was relative to Officer Aragon when he commenced firing.

With respect to whether any personal danger Officer Aragon did face was abated after his first or second shots, Plaintiffs essentially argue that: (1) multiple shots — including, potentially, the fatal shot — were fired from the side or side-rear of the truck; (2) Officer Aragon was a safe distance away from the truck when these shots were fired; and (3) Officer Aragon had or should have had the ability to stop firing once he was out of the path of the oncoming truck. (*See* Pls.' Resp. at 7–8, 27–28.) I find that the evidence — again taken in the light most favorable to Plaintiffs — could support any such theory. First, multiple detectives, criminalists, and experts testified that multiple shots came from the side or side-rear of the truck, and Defendants concede as much for the purposes of this motion. (*See, e.g.*, Defs.' Br. at 13 [conceding that "the other four bullets fired by Officer Aragon entered the side of the truck" and that "the bullet that killed (Mr.) Cordova entered the truck through the side of the vehicle, and was fired after some or all of the truck had passed Officer Aragon"].) Second, Mr. Feiereisen's, Officer Nance's, and Officer Aragon's testimony — again taken in the light most favorable to Plaintiffs — arguably support the theory that Officer Aragon was a "safe" distance away from the truck when he fired the fatal shot. (*See, e.g.*, Pls.' Resp., Ex. 1 at 2 [Feiereisen Aff.] [testifying that "(Officer Aragon) was at least (thirteen) feet from the path of (Mr. Cordova's) vehicle when he fired" the fatal shot], Ex. 22 at 2 [Nance Diagram] [depicting Officer Aragon's terminal position to be on the far side of I-76], Ex. 18 at 13 [5/3/06 Statement] [Officer Aragon recounting that he was five to seven feet away from the truck when he fired the second two shots into the driver's side window].)[13] By

---

[13]I decline to assess the admissibility of Mr. Feiereisen evidence on this point as it is merely cumulative.

contrast, the only evidence that Officer Aragon was not a "safe" distance away from the truck when he fired the latter shots is his own affidavit testimony, which I find that the the jury could find untrustworthy for the reasons cited *supra*.  (*See* Defs.' Br., Ex. D [Aragon Aff.] [affying that he felt "in imminent danger of death" while firing, and that "the truck came very close to [him] and barely missed [his] body"].)  Finally, while Officer Nance's unrefuted testimony suggests that Officer Aragon fired all his rounds in one or two seconds, (*see* Defs.' Br., SOF ¶ 61; *admitted at* Pls.' Resp., RSOF ¶ 61), both Mr. Willard's and Sgt. McCoy's testimony — at least taken in the light most favorable to Plaintiffs — arguably suggest that Officer Aragon could have stopped firing when the truck ceased posing a danger to him.  (*See* Pls.' Resp., Ex. 4 at 1–2 [Willard Aff.] [affying that "one trained in the use of that pistol in tactical shoot/no shoot scenarios would have no difficulty ceasing firing when the danger ceased"], Ex. 13 at 9 [McCoy Dep.] [testifying that, in firearms training, officers are taught that "as soon as the threat is gone . . . that they're not to fire anymore"].)[14]  Accordingly, I find that a reasonable jury could conclude that any personal danger Officer Aragon did face was abated after his first or second shots.

Second, Plaintiffs appear to argue that, even assuming Officer Aragon was ever in any immediate personal danger, his own reckless actions in the seconds leading up to the shooting put him there because: (1) he could have remained behind his patrol car which was allegedly between himself and the approaching truck; and (2) he put himself at risk — and, in the process, violated CCPD policy — by attempting to deploy stop sticks in the path of an approaching

---

[14]I decline to assess the admissibility of Mr. Willard's testimony on this point as it is also merely cumulative.

vehicle and/or by placing himself in the only escape channel (*i.e.*, the entrance ramp from 136th Avenue) that he had created while blocking westbound I-76. (*Id.* at 2, 6, 8, 27–29.) I again find that the facts, taken in the light most favorable to Plaintiffs, could support either such theory.

With respect to whether Officer Aragon could have remained behind his patrol car, I note that Officers Aragon and Nance have diametrically opposed memories regarding which direction the patrol car was facing, and thus that this fact is properly in dispute. (*See id.*, SAF ¶ 1; *admitted at* Defs.' Reply, RSAF ¶ 1.) Moreover, because the undisputed testimony shows that Officer Aragon received the stop sticks from the rear driver's side door of his vehicle, I conclude that a reasonable jury could agree with Plaintiffs' theory that Officer Aragon could have remained behind his patrol car in the face of the approaching truck, assuming the jury accepts Officer Nance's testimony regarding which direction the car was facing. (*See id.*, SAF ¶ 31; *admitted at* Defs.' Reply, RSAF ¶ 31.)

With respect to Plaintiffs' allegation that Officer Aragon put himself at risk — and, in the process, violated CCPD policy — by deploying stop sticks in the path of Mr. Cordova's truck and/or in the only escape channel created by his roadblock, I conclude that the relevant CCPD policies sufficiently support such a theory, as does the testimony of multiple police officers. (*See, e.g.*, *id.*, Ex. 16 at 15 [CCPD Manual] [stating that "[o]fficers **MUST** deploy such devices from a position where they are protected from being struck by the pursued vehicle" (emphasis in original)], Ex. 14 at 6 [Robinson Dep.] [acknowledging that "common sense" would tell an officer to remove himself from danger if possible], Ex. 7 at 8 [Baker Dep.] [acknowledging that — at least in the abstract — he would not want to the be in the escape channel he had created

pursuant to roadblock policy].)  Accordingly, I find that a reasonable jury could conclude that Officer Aragon put himself at risk and violated CCPD policies by attempting to deploy stop sticks on or near the entrance ramp from 136th Avenue in the seconds before the shooting.

Third, Plaintiffs apparently argue that Officer Aragon's actions in the minute or minutes immediately preceding the shooting were also reckless and/or contributed to his ultimate perceived need to shoot Mr. Cordova in self-defense.  (*Id.* at 1–2, 5, 26–27.)  Specifically, Plaintiffs appear to argue that Officer Aragon was reckless in crossing over the median to the westbound lanes of I-76 and in allegedly stopping his patrol car only roughly a mile from where he crossed the median, thus depriving himself of adequate time to safely deploy the stop sticks and move out of the escape channel he had created on the entrance ramp from 136th Avenue. (*Id.*)  I again find that the facts, taken in the light most favorable to Plaintiffs, could support such theories.

With respect to Officer Aragon's alleged recklessness in crossing over the median to the westbound lanes of I-76, I note that Sgt. Robinson ordered the pursuit terminated as soon as he learned that cars were traveling the wrong direction on this highway.  (*See id.*, SAF ¶ 47; *admitted at* Defs.' Reply, RSAF ¶ 47.)  I find that this fact — either alone, or in conjunction with a jury's common sense — could support a reasonable jury's conclusion that Officer Aragon acted recklessly in crossing the median.

With respect to Officer Aragon's alleged recklessness in stopping his patrol car just roughly a mile from where he had crossed the median, Defendants argue that the only evidence even suggestive of such recklessness — Mr. Willard's implied expert opinion that Officer

Aragon did not have adequate time to deploy his stop sticks — is inadmissible for multiple reasons.[15]  (*See* Defs.' Reply at 23–24; *see also* Defs.' Exclusion Br.)  While I am inclined to agree with Defendants' inadmissibility arguments, I need not address them because — as demonstrated below — Plaintiff's theory regarding Officer Aragon's alleged recklessness in crossing the median has virtually no legal impact upon the assessment of whether his actions were objectively reasonable.  (*See* Analysis § 2aic, *infra*.)  Accordingly, I assume for the purposes of this motion that Mr. Willard's testimony is admissible, and moreover find that a reasonable jury could conclude from such evidence that Officer Aragon's decision to stop his patrol car only roughly one mile from where he crossed the median deprived him of adequate time to safely deploy the stop sticks.

   In sum, taking the facts in the light most favorable to Plaintiffs, I agree with each of their apparent theories as to the conclusions these facts support — to wit, that: (1) Officer Aragon was in no immediate personal danger when he fired the one or two shots from a position in front of Mr. Cordova's truck; (2) if Officer Aragon did face any personal danger, it was abated after his first or second shots; (3) Officer Aragon could have remained behind his patrol car in the face of the approaching truck; (4) Officer Aragon put himself at risk and violated CCPD policies by attempting to deploy stop sticks somewhere on or near the entrance ramp from 136th Avenue in the seconds before the shooting; (5) Officer Aragon acted recklessly in crossing the median; and

---

[15]For instance, Defendants argue that "Mr. Willard does not state how he arrived at the precise location of the point where Officer Aragon crossed the median, and does not state why he assumed that Officer Aragon traveled at [fifty] miles per hour consistently from that point to the terminus."  (*See* Defs.' Reply at 23–26.)

(6) Officer Aragon's decision to stop his patrol car only roughly a mile from where he crossed the median deprived him of adequate time to safely deploy the sticks.

Despite so finding, however, I must also present those additional undisputed facts that are also relevant to my assessment of whether Officer Aragon's actions in terminating the police chase were objectively reasonable. These undisputed facts were that: (1) by the time Officer Aragon shot Mr. Cordova, Mr. Cordova had repeatedly refused to stop for multiple patrol cars with their lights and sirens activated, (*see, e.g.*, Defs.' Br., SOF ¶¶ 24–25; *admitted in relevant part at* Pls.' Resp., RSOF ¶¶ 24–25); (2) during the chase, Mr. Cordova had run through at least two red lights and driven off the road at least twice to avoid other officers' deployment of stop sticks, (*see id.*, SOF ¶¶ 7, 27, 32, 37; *admitted at* Pls.' Resp., RSOF ¶¶ 7, 27, 32, 37); (3) also during the chase, Mr. Cordova had allegedly[16] attempted to ram Officer Rubino's patrol car, ram Officer Aragon's patrol car, and drive toward Officer Nance as he stood on the median, (*see, e.g.*, *id.*, Ex. B ¶ 5 [Rubino Aff.], Ex. C ¶¶ 14, 18 [Nance Aff.], Ex. D ¶ 14 [Aragon Aff.]); and (5) at the time Officer Aragon shot Mr. Cordova, Mr. Cordova was driving his truck hauling a

_____

[16]Plaintiffs appear to suggest that the mere fact that these events were recounted by CCPD officers creates a triable question of fact as to whether they actually occurred. (*See, e.g.*, Pls.' Resp., RSOF ¶¶ 22, 24, 42, 49–50.) Nonetheless, Plaintiffs proffer no evidence suggesting that these events did not occur. (*See id.*) While I am unpersuaded by Plaintiffs' implicit suggestion that police officer testimony is inherently unreliable in this case, and moreover find this suggestion insufficient to carry their summary judgment burden of designating "specific facts showing that there is a genuine issue for trial," *Celotex*, 477 U.S. at 324, I alternatively note that — at a minimum — Plaintiffs have admitted that Officer Aragon heard over the radio that Mr. Cordova had attempted to ram Officer Rubino's patrol car. (*See* Defs.' Br., SOF ¶ 23; *admitted at* Pl.'s Resp., RSOF ¶ 23). Accordingly, even if I found that the above-cited facts were properly in dispute, such a finding would only be minimally relevant as it would remain undisputed that a reasonable officer in Officer Aragon's position would have heard that Mr. Cordova had attempted to ram Officer Rubino's patrol car, whether or not this were true.

skid-steer loader the wrong way down I-76, an interstate highway, (*see id.*, SOF ¶¶ 2, 40; *admitted in relevant part at* Pls.' Resp., RSOF ¶¶ 2, 40).

Thus, having "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party, *to the extent supportable by the record*," I proceed to consider whether Officer Aragon's alleged actions in shooting Mr. Cordova constituted a Fourth Amendment violation as a matter of law. *Scott*, 127 S. Ct. at 1776 n.8 (emphasis in original).

> (c)      **Whether Officer Aragon's Alleged Actions Violated the Fourth Amendment**

Despite Plaintiffs' exhaustive discovery in this case, and meticulous efforts in parsing each of Defendants' proffered facts and supplementing such facts with additional facts of their own, Plaintiffs inexplicably fail to offer a single legal citation in the section of their brief dedicated to showing that Officer Aragon's actions were "unreasonable" as a matter of law. (*See* Pls.' Resp. at 26–29.) I find this amazing omission alternatively troubling and telling; I can only assume from this fact that Plaintiffs' zeal in pointing out every factual dispute in this case derives from either a genuine ignorance as to which factual disputes are material, or reflects a concerted effort to obscure those undisputed facts that are both material and dispositive of their Fourth Amendment claim. Whatever Plaintiffs' reasoning — or lack thereof — in failing to offer any legal argument on the primary question of their central claim, I find for the reasons set forth below that they have failed to satisfy the first part of their "heavy" two-part burden of showing that Officer Aragon's actions violated a constitutional right. *Mecham*, 500 F.3d at 1204.

I find that Officer Aragon's actions in using deadly force to terminate the police chase were objectively reasonable in light of all the facts and circumstances confronting him. *See Graham*, 490 U.S. at 396–97. First, with respect to the "severity of the crime at issue," *Casey*, 509 F.3d at 1281, in addition to apparently stealing the skid-steer loader, Mr. Cordova had committed multiple traffic offenses that put himself, the pursuing officers, and the public at risk, including: (1) refusing to stop while being pursued by multiple police vehicles with their lights and sirens activated; (2) running through at least two red lights; (3) driving off the road at least twice to avoid officers' deployment of stop sticks; (4) allegedly[17] attempting to ram Officers Rubino's and Aragon's patrol cars, and driving toward Officer Nance as he stood on the median; and (5) most importantly and obviously, driving the wrong way down I-76, an interstate highway. (Defs.' Br., SOF ¶¶ 2, 7, 24–25, 27, 32, 37, 40; *admitted in relevant part at* Pls.' Resp., RSOF ¶¶ 2, 7, 24–25, 27, 32, 37, 40; *see also id.*, Ex. B ¶ 5 [Rubino Aff.], Ex. C ¶¶ 14, 18 [Nance Aff.], Ex. D ¶ 14 [Aragon Aff.].)

Second, with respect to whether Mr. Cordova posed "an immediate threat to the safety of the officers and others," *Casey*, 509 F.3d at 1281, I note that — irrespective of whether Officer Aragon was in immediate personal danger at the moment he fired — Mr. Cordova was proceeding the wrong way down I-76, and thus posed a serious threat to any innocent motorist who was or could have been proceeding in the opposite direction, and who thus risked a head-on

---

[17]As noted above, even if a triable question of fact exists as to whether these events actually occurred, it remains undisputed that a reasonable officer in Officer Aragon's position would have heard that Mr. Cordova had attempted to ram Officer Rubino's patrol car. *See* note 16, *supra*.

collision with a truck hauling a skid-steer loader. Moreover, even if this threat cannot properly be termed "immediate" because no evidence suggests that westbound traffic was immediately approaching when Officer Aragon fired, the Supreme Court in *Harris* contemplated the weighing of foreseeable danger to third-parties in deciding whether the use of deadly force to terminate a police chase was objectively reasonable. *See Harris*, 127 S. Ct. at 1778 (noting that a plaintiff "posed an actual and imminent threat to the lives of any pedestrians *who might have been present*, to other civilian motorists, and to the officers involved in the chase" [emphasis added]). Moreover, the Supreme Court in *Harris* also held that, "in weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing [a driver]," it is appropriate to "take into account not only the number of lives at risk, but also their relative culpability." 127 S. Ct. at 1777. In the instant case, I find that the probability of Mr. Cordova eventually injuring or killing either a police officer or a civilian motorist had Mr. Cordova continued to elude police was significant given: (1) Mr. Cordova's apparent disregard for traffic laws; (2) apparent willingness to ram his way out of confined spaces; (3) and apparent last-minute decision to continue proceeding the wrong way down the entrance ramp from 136th Avenue rather than cross back over the median when confronted with Officer Aragon's roadblock.[18]  (*See, e.g.*, Defs.' Br. SOF ¶¶ 7, 24–25, 27, 32, 37, 52; *admitted in*

---

[18]As noted above, Officer Aragon positioned his car to lead the truck's driver to either cross back into the eastbound lanes of I-76, or to exit I-76 completely by taking the entrance from 136th Avenue.  (*See* Pls.' Resp., Ex. 10 at 6–7 [Aragon Dep.], Ex. 18 at 9–10 [5/3/06 Statement].)  At the last minute, it appears that Mr. Cordova decided to head toward Officer Aragon's position somewhere on or near the entrance ramp from 136th Avenue.  (*See, e.g.*, Defs.' Br., SOF ¶ 52; *admitted at* Pls.' Resp., RSOF ¶ 52.)

*relevant part at* Pls.' Resp., RSOF ¶¶ 7, 24–25, 27, 32, 37, 52; *see also id.*, Ex. B ¶ 5 [Rubino

Aff.].)  In addition, I note that any officers or motorists who could foreseeably have been injured

or killed in an accident with Mr. Cordova were completely innocent.  *See Harris*, 127 S. Ct. at

1778.  Accordingly, as viewed from the perspective of a reasonable officer forced to make a

"split-second judgment[]," *Allen*, 119 F.3d at 840, as to the relative risk Mr. Cordova posed to

officers and the general public versus the risk that shooting him posed to his Fourth Amendment

interest to be free from the use of excessive force, I find that Officer Aragon's decision to fire at

Mr. Cordova's truck was objectively reasonable.

Lastly, I note that there is no factual dispute as to whether Mr. Cordova was "actively

resisting arrest or attempting to evade arrest by flight," *Casey*, 509 F.3d at 1281, and thus find

that this factor additionally militates in favor of finding Officer Aragon's actions objectively

reasonable.

As noted above, Plaintiffs make no legal arguments in opposition to the above

conclusions, but instead present a series of unconnected factual arguments suggesting that: (1)

Officer Aragon was not in immediate personal danger when he fired at Mr. Cordova's truck; (2)

Officer Aragon could have taken different actions to reduce any personal danger he was in; and

(3) Officer Aragon was reckless in crossing median and/or by attempting to deploy the stop

sticks within roughly a mile of where he crossed the median.  (*See* Pls.' Resp. at 26–29.)  While I

agree that the facts could support any such theory, I find that the legal significance of any such

theory is virtually nil.

First, regardless of whether Officer Aragon was ever in any personal danger — or whether he ever perceived himself to so be — I find that the threat Mr. Cordova posed to himself, to the pursuing officers, and to the general public in continuing to evade police itself justifies Officer Aragon's "split-second" decision to use deadly force. *Allen*, 119 F.3d at 840. Moreover, I note that any factual dispute over Officer Aragon's subjective state of mind in firing on Mr. Cordova's truck (*e.g.*, whether or not he was "pissed," or whether or not he subjectively feared for his life) is irrelevant because Fourth Amendment objective reasonableness must be assessed "without regard to [an officer's] underlying intent or motivation."[19] *Graham*, 490 U.S. at 397.

Second, I find the fact that Officer Aragon could have taken different actions to reduce any personal danger he faced — either by remaining behind his patrol car as Mr. Cordova's truck approached, or by not attempting to deploy stop sticks in the only escape channel created by his roadblock, or by accelerating further ahead of Mr. Cordova's truck before creating his roadblock — irrelevant to my above analysis. Plaintiffs have cited no law suggesting that an officer may only neutralize a danger to other officers and the public if he simultaneously eschews any personal danger to himself, and I find such a rule tantamount to a proposed constitutional prohibition on valor. Moreover, I note that an officer's "own reckless or deliberate conduct during [a] seizure" is only relevant to an excessive force analysis when that officer's conduct "*created the need to use such force*." *See Medina*, 252 F.3d at 1132 (emphasis

_____

[19]Plaintiffs appear to be confused on this point, claiming in clear contravention of established constitutional law on qualified immunity that "[Officer] Aragon's state of mind is at issue." (Pls.' Br. at 3.)

added).  In the instant case, even assuming that Officer Aragon acted recklessly in placing

himself in the path of Mr. Cordova's oncoming truck, it was not Officer Aragon's presence in

the path of this truck that created the need to use deadly force; instead, it was the presence of this

truck in the wrong lanes of I-76, Mr. Cordova's apparent disregard for traffic laws, Mr.

Cordova's apparent willingness to use force to extricate himself from confined areas, Mr.

Cordova's attempted ramming of at least one police vehicle, and Mr. Cordova's apparent last

minute decision to continue proceeding the wrong direction down the entrance ramp from 136th

Avenue rather than cross back over the median, that created the need to use deadly force.

Moreover, in *Harris*, the Supreme Court explicitly rejected a logically analogous argument that

police must cease a pursuit whenever it becomes too dangerous to the public:

> Couldn't the innocent public equally have been protected, and the tragic accident
> entirely avoided, if the police had simply ceased their pursuit?  We think the
> police need not have taken that chance and hoped for the best. . . .  First of all,
> there would have been no way to convey convincingly to respondent that the
> chase was off, and that he was free to go.  Had respondent looked in his rear-view
> mirror and seen the police cars deactivate their flashing lights and turn around, he
> would have had no idea whether they were truly letting him get away, or simply
> devising a new strategy for capture.  Perhaps the police knew a shortcut he didn't
> know, and would reappear down the road to intercept him; or perhaps they were
> setting up a roadblock in his path.  Given such uncertainty, respondent might have
> been just as likely to respond by continuing to drive recklessly as by slowing
> down and wiping his brow. . . .  Second, we are loath to lay down a rule requiring
> the police to allow fleeing suspects to get away whenever they drive so recklessly
> that they put other people's lives in danger.  It is obvious the perverse incentives
> such a rule would create: Every fleeing motorist would know that escape is within
> his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow
> line a few times, and runs a few red lights.

*Harris*, 127 S. Ct. at 1778–79.  The Supreme Court's analysis in *Harris* has particular resonance

here where the police had actually already terminated their pursuit once — with Officer Zamora

deactivating his lights and siren — only to resume it later, and where Officer Aragon had actually already attempted to head Mr. Cordova off once by taking an alternate route to Highway 2/Sable Road to deploy stop sticks. (*See* Defs.' Br., SOF ¶¶ 11, 24, 28; *admitted in relevant part at* Pls.' Resp., RSOF ¶¶ 11, 24, 28.) Finally, despite having taken great pains to extract qualified admissions from various police officers that Officer Aragon's actions may have violated CCPD policies, (*see, e.g.*, Pls.' Resp., Ex. 14 at 6 [Robinson Dep.], Ex. 13 at 11 [McCoy Dep.], Ex. 7 at 8 [Baker Dep.]), Plaintiffs draw no legal conclusions from such admissions, (*see id.* at 26–29), and I find that there are none to be drawn because the "the violation of a police department regulation is insufficient for liability under section 1983." *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995) (citing *Davis v. Scherer*, 468 U.S. 183, 194 [1984]), *abrogated on other grounds as recognized by Jennings v. City of Stillwater*, 383 F.3d 1199, 1207–08 (10th Cir. 2004). Third, I find the fact that Officer Aragon may have acted recklessly in crossing the median simply irrelevant to my above holding, and note that Plaintiffs have made no attempt to show the legal relevance of this fact. Instead, Plaintiffs' only halfhearted attempt to draw any legal or factual conclusions from this fact is their single assertion — in the fact section of their brief — that "it could . . . be assumed that [Mr.] Cordova crossed the median because [Officer] Aragon did." (Pls.' Resp., SAF ¶ 40.) Because I find such speculation insufficient to demonstrate a triable issue of fact as to whether Officer Aragon's crossing of the median somehow caused Mr. Cordova to follow him, and thus somehow contributed to Officer Aragon's eventual decision to use deadly force because Mr. Cordova was traveling the wrong way down I-

76, I find this fact irrelevant to my analysis of objective reasonableness. *See Celotex*, 477 U.S. at

324 (requiring nonmovant to designate specific *facts* demonstrating a genuine issue for trial).

Accordingly, for the foregoing reasons, I find that Officer Aragon's actions in

terminating the police chase through the use of deadly force were objectively reasonable, and

that Officer Aragon is entitled to summary judgment on Plaintiff Tracey Cordova's Fourth

Amendment claim.

### ii. Whether Officer Aragon's Actions Violated Clearly Established Law

Alternatively, I find that Plaintiffs have failed to show that Officer Aragon violated

clearly established law at the time of his alleged constitutional violation.

To show that a constitutional right was clearly established, a plaintiff must show that

"'the right was sufficiently clear that a reasonable officer would understand that what he is doing

violates that right.'" *Mecham*, 500 F.3d at 1205 (quoting *Medina*, 252 F.3d at 1128). "'To

survive a motion for summary judgment, the plaintiff must show the right was clearly established

in the particularized sense. . . . [That is,], there must ordinarily be a Supreme Court or a Tenth

Circuit decision on point, or clearly established weight of authority from other circuits.'" *Id*.

(quoting *Wilson*, 52 F.3d at 1552).

"'The difficult part of this inquiry is identifying the level of generality at which the

constitutional right must be clearly established.'" *Fogarty*, 2008 WL 1765018, at *11 (quoting

*Casey*, 509 F.3d at 1282 [further internal quotation marks omitted].) Because courts cannot find

qualified immunity whenever there is a new fact pattern, the Tenth Circuit uses "a sliding scale

to determine when law is clearly established." *Id*. "Under this approach, '[t]he more obviously

egregious the conduct in light of prevailing constitutional principles, the less specificity is required from previous case law to clearly establish the violation.'" *Id*. (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 [10th Cir. 2004]).

In the instant case, Plaintiffs cite just two cases to suggest that Officer Aragon's actions violated clearly established law. (Pls.' Resp. at 25–26.) For the following reasons, I find that neither case is sufficient to satisfy the second part of Plaintiffs' "heavy" two-part burden. *Mecham*, 500 F.3d at 1204.

First, Plaintiffs cite *Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995), for the propositions that: (1) "[Officer] Aragon was . . . required . . . to be in immediate danger" to use deadly force; and (2) Officer Aragon's use of deadly force was unreasonable "if he recklessly or deliberately placed himself in the zone of danger." (Pls.' Resp. at 26.) *Sevier* holds no such things. Read even at the highest level of generality, extracting just its pure principles of law, *Sevier* states that, in a "totality of the circumstances" analysis of objective reasonableness, courts may consider "whether the officers were in danger at the precise moment that they used force and whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." 60 F.3d at 699. Far from creating a *per se* rule that officers need "to be in immediate danger" to use deadly force, *Sevier* explicitly repeats the well-established rule that the use of deadly force is justified when "a reasonable officer in [d]efendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves *or others*." 60 F.3d at 699 (citing *Graham*, 490 U.S. at 396) (emphasis added). As discussed above, Officer Aragon's actions were objectively reasonable

based upon the threat Mr. Cordova posed to himself, to the other pursuing officers, and to the public, whether or not they were additionally objectively reasonable based upon the threat Mr. Cordova posed to Officer Aragon. Moreover, far from suggesting that the use of deadly force is *per se* impermissible whenever an officer "recklessly or deliberately placed himself in the zone of danger," *Sevier* states that such a consideration is only relevant when such recklessness "*created the need to use such force.*" *Id.* (emphasis added). As discussed above, it was Mr. Cordova's, and not Officer Aragon's, actions that created the need to use deadly force because it was Mr. Cordova's actions that propagated the myriad dangers incident to a police chase. Finally, the specific facts of *Sevier* further demonstrate its utter inapplicability as persuasive authority for the case at bar. The court in *Sevier* addressed whether police officers' allegedly reckless actions in drawing a suicidal man out of his bedroom had contributed to their ultimate perceived need to shoot the man in self-defense when he allegedly lunged at them with a knife.[20] *See* 60 F.3d at 697–99, 700–01 & n.10. Thus, *Sevier* is inapposite to suggest either the reasonableness or unreasonableness of using deadly force both to defend oneself and to neutralize a severe threat to others, even if the danger to oneself is self-created. *See, e.g.*, *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (finding *Sevier* distinguishable even from a case in which a plaintiff actively menaced a police officer with a knife because the "officers [in *Sevier*] had no reason to suspect that [the plaintiff in *Sevier*] posed any threat to

---

[20]Moreover, the court in *Sevier* did not even hold that the officers' use of deadly force was unreasonable due to their allegedly reckless actions; instead, the court merely alluded to such an argument in *dicta*, while deciding that it lacked jurisdiction over the defendants' interlocutory appeal of the district court's denial of qualified immunity on summary judgment. *See* 60 F.3d at 700–01.

others while he remained in his room").  In short, viewed at either a high level of generality, or a high level of specificity concomitant with my finding that Officer Aragon committed no Fourth Amendment violation, *Sevier* is insufficient to demonstrate that Officer Aragon violated a clearly established right at the time of his alleged constitutional violation.

Second, Plaintiffs allude to *Tennessee v. Garner*, 471 U.S. 1 (1985), but fail to provide a single sentence in their brief suggesting how Officer Aragon allegedly violated any rule of law purportedly established in *Garner*.  (*See* Pls.' Resp. at 26.)  Rather than attempt to divine the alleged relevance of *Garner*, I need merely invoke the Supreme Court's recent pronouncement in *Harris* that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'"[21]  *Harris*, 127 S. Ct. at 1777.  Instead, the Court noted that *Garner* was "simply an application of the Fourth Amendment 'reasonableness' test," and implicitly found *Garner* to be unpersuasive on the reasonableness of the use of deadly force to terminate a police chase because "*Garner* held that it was unreasonable to kill a 'young, slight, and unarmed' burglary suspect by shooting him 'in the back of the head' while he was running away on foot, and . . . when the officer 'could not have reasonably believed that [the suspect] . . . posed any threat,' and 'never attempted to justify his actions on any basis other than the need to prevent an escape.'"  *Id.* (internal citations omitted).  The Court

---

[21]In direct contradiction of this statement, Plaintiffs claim in their brief that "the recent case of [*Harris*] . . . reaffirms that *Garner* . . . remain[s] the law governing the use of deadly force."  (Pls.' Resp. at 4.)  Given the blatant error of this statement — or, at a minimum, its extreme imprecision — I cannot help wonder whether Plaintiffs even read this case.

in *Harris* moreover rejected the respondent's contention in that *Garner* established specific

"preconditions" on the use of deadly force:

> Whatever *Garner* said about the factors that might have justified shooting the
> suspect in that case, such 'preconditions' have scant applicability to this case,
> which has vastly different facts. *Garner* had nothing to do with one car striking
> another or even with car chases in general. . . . [T]he threat posed by the flight on
> foot of an unarmed suspect [is not] even remotely comparable to the extreme
> danger to human life posed by respondent in this case. . . . Whether or not [the
> officer's] actions constituted application of 'deadly force,' all that matters is
> whether [the officer's] actions were reasonable.

*Id*. at 1777–78 (further internal quotations and citations omitted). Thus, given the Supreme

Court's clear direction to lower courts to assess the objective reasonableness of the use of deadly

under the traditional "totality of the circumstances" approach, and given the Court's implicit

suggestion that *Garner* is utterly *un*persuasive authority on the reasonableness of the use of

deadly force in terminating a police chase, I find Plaintiffs' unelaborated allusion to *Garner*

insufficient to demonstrate that Officer Aragon violated clearly established law at the time of his

alleged constitutional violation.

Accordingly, for the foregoing reasons, I find that Plaintiffs have also failed to carry the

second part their "heavy" two-part burden of showing that Officer Aragon violated a clearly

established right and that summary judgment must issue for Officer Aragon on Plaintiff Tracey

Cordova's Fourth Amendment claim for this reason as well.

     **b.**     ***The City of Commerce City's Entitlement to Summary Judgment on Plaintiff***
             ***Tracey Cordova's Fourth Amendment Claim***

Having found that Officer Aragon committed no Fourth Amendment violation, I need not

consider whether Plaintiffs have adduced sufficient evidence to suggest that a municipal policy

or custom of the City of Commerce City caused such a violation.  *See, e.g.*, *Vigil v. S. Valley Acad.*, 247 F. App'x 982, 991 (10th Cir. 2007) ("We have previously held that municipal liability may not be imposed on an entity defendant where individual defendants are found to have committed no constitutional violation") (citations omitted).  Accordingly, I find that the City of Commerce City is also entitled to summary judgment on Plaintiff Tracey Cordova's Fourth Amendment claim.

### c.   *Officer Aragon's Entitlement to Summary Judgment on Plaintiffs' State Law Claims*

Lastly, Defendants contend that Plaintiffs cannot overcome state governmental immunity on their state wrongful death claims against Officer Aragon because they cannot prove that his actions were "willful or wanton."  (Defs.' Br. at 34.)  Specifically, Defendants claim:

> Officer Aragon's actions during the pursuit were designed to protect the public and to defend himself against an imminent deadly threat posed by [Mr.] Cordova.  There is no competent evidence to suggest that . . . Officer Aragon acted heedlessly and recklessly, without regard for the safety of others.  Officer Aragon acted to defend himself, his fellow officers, and the public, and his actions were reasonable.

(*Id.* at 34.)  By contrast, Plaintiffs respond in just two sentences, claiming that: "Fabricating a scenario which satisfies the Constitutional [sic] standard and written policies and procedures[22] indicated [Officer] Aragon knew what he did violated the law by which he is governed.  Using deadly force, knowing it is un justified [sic] is clearly willful and wanton."  (Pls.' Resp. at 31.)

---

[22]Although Plaintiffs fail to explain what they mean by this allegation, the court presumes that Plaintiffs are alleging that Officer Aragon lied to the CCPD detectives on the day of the shooting by suggesting that he fired in self-defense, and additionally presumes that Plaintiffs presume that self-defense is the "Constitutional [sic] standard," and a prerequisite for the use of deadly force under Section 2.1.11 of the CCPD Policy and Procedure Manual.

The Colorado Governmental Immunity Act ("CGIA"), Colorado Revised Statutes section 24–10–101 *et seq.*, provides in relevant part that:

> A public employee shall be immune from liability in any claim for injury . . . which lies in tort or could lie in tort . . . which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton.

C.R.S. § 24–10–118(2)(a) (2008). Although the CGIA provides no statutory definition of the term "willful and wanton," the Colorado Supreme Court has defined this term for the purposes of the CGIA to mean "'conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others, particularly the plaintiff." *Anderson v. Bd. of Comm'rs*, No. 06–cv–1492–LTB—BNB, 2006 WL 3355166, at *4 (D. Colo. Nov. 17, 2006) (quoting *Moody v. Ungerer*, 885 P.2d 200, 205 [Colo. 1994]).

In the instant case, Defendants provide virtually no legal analysis suggesting that they are entitled to summary judgment on Plaintiffs' wrongful death claims beyond simply pointing to the case law definition of "willful and wanton," and suggesting that — based upon their interpretation of the facts — Officer Aragon's actions were not "willful and wanton." (*See* Defs.' Br. at 34.) Conspicuously absent from such a discussion is any analysis of the substantive burdens of proof, any consideration of whether the assessment of "willful and wanton" conduct is a question of fact or law, or any discussion of Colorado case law addressing whether a police officer's constitutional use of force — as adjudged under the standard of objective reasonableness — exempts such force from the definition of "willful and wanton" conduct,

which is defined to include "conduct . . . which the actor *must have realized as dangerous*, *done heedlessly and recklessly*," and thus apparently encompasses both objective and subjective elements. *Anderson*, 2006 WL 3355166, at *4 (emphasis added). Because I note that there are disputed questions of fact as to Officer Aragon's actual subjective state of mind in firing upon Mr. Cordova, (*compare, e.g.*, Pls.' Resp., Ex. 9 at 8 [Nance Dep.] [Officer Nance testifying that Officer Aragon had told him that Officer Aragon was "a little pissed" after the shooting], *with id.*, Ex. 10 at 3 [Aragon Dep.] [Officer Aragon denying ever having been "pissed" during the incident]), and because Defendants have failed to present a compelling argument that they are entitled to summary judgment on Plaintiffs' state law claims, I exercise my discretion under 28 U.S.C. § 1367(c)(3) to decline supplemental jurisdiction over Plaintiffs' state law claims, and dismiss such claims without prejudice. *See* 28 U.S.C. § 1367(c)(3) (2006) (stating that district court may decline supplemental jurisdiction "if . . . [it] has dismissed all claims over which it has original jurisdiction").

*3.*    *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.    DEFENDANTS' motion for summary judgment (#41) is GRANTED with respect to Plaintiff Tracey Cordova's Fourth Amendment claim against both Defendants. The clerk shall forthwith enter judgment in favor of Defendants and against Plaintiff Tracey Cordova, dismissing Plaintiff Tracey Cordova's Fourth Amendment claim against both Defendants with prejudice;

2.      The clerk shall also forthwith enter judgment in favor of Officer Aragon and

        against Plaintiffs, dismissing Plaintiffs' state law claims without prejudice for

        want of jurisdiction;

3.      Defendants' motion to strike (#52) is DENIED as moot; and

4.      Defendants' motion to exclude expert testimony (#57) and Plaintiffs' motion for

        an extension of time to file a reply (#59) are DENIED as moot.

5.      Defendants may have their costs by filing a bill of costs within eleven days of the

        date of this order.

Dated this 20th day of May, 2008.


                                        BY THE COURT:


                                        s/Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        Chief United States District Judge